Good morning, Your Honors. Martin Guajardo on behalf of Jaisalmer Singh. The issue for us is, I think, initially, the asylum officer's assessment that he has in this case and the way it was used by the court. I think if we take a look at the second to the last hearing in this case, we're going to find that the officer was not present in the courtroom. The transcript tells us that. Number two, we have no idea of what documents other than what was represented as fax documents that were sent to him. And then we go through about 15 to 20 pages of transcript where the officer is attempting to, one, review his notes, admits that he's made some mistakes on the note-taking, admits that possibly a figure that he has set forth in his assessment is a figure that is not the same amount as what was set forth in the application. And at the end of that, if you will, both his examination and the cross that occurred, we realize a number of things. One, nowhere in the record can we find the actual documents or anyone in that courtroom to know what documents he was actually looking at other than he identified that there was an application, asylum application. He identified he had his notes, and he identified that he had presumably the declaration that accompanied the application. But he's never in the courtroom, so we really don't know what he looked at besides those documents. Well, we don't know. Did anybody ask him that question? Interestingly enough, no. Well, then whose fault is that? Well, it seems that he's being brought in, as you would in a civil case. You have depositions that have been taken. You want to make sure that your depositions contain all the information with regards to who was deposed and what was said and so forth, and that you have a complete record. We begin with the following, and that is we're going to rely on this assessment. It's not the assessment as such. The officer testified to what questions he asked and what answers were given. That's not an assessment. That's a statement about what was said, isn't it? Well, but is that the test that we're supposed to use? In this, in the decision by this Court, the Jarnell case, this Court concludes that in that assessment to refer to the assessment. However, they did use the assessment. The asylum officer did not testify, and it wasn't from his notes about what he asked and what was answered. So you can't just use the assessment, which is a conclusion or opinion of the asylum officer, and base it on that alone. But that's not what happened here. In this case, do we have the question, do we have a question and answer, do we have an accurate record from the officer's notes? It doesn't appear that we have, but that's not all that extraordinary. I mean, you'll frequently have witnesses testifying about earlier conversations, and almost never do they have a Q&A. They simply say what happened in the earlier conversation. That is admissible evidence. And do we have anything in the assessment that indicates that the officer swore the interpreter so that he understood that the interpreter would test, would interpret correctly? We don't have that in that assessment. Do we know that how he proceeded to place the applicant under oath? We don't have that in the assessment. And do we have any explanation from him as to when he elects in this summary, in this assessment summary, if you will, when he elects to take information off of the application and then mix it in with a little bit of the information that he's received during the asylum interview? We have no way of making that determination. As to that last part, I'm not sure what the problem there is. The difficulty, the reason the IJ determined that your client's credibility could not be established or trusted was the inconsistency. To the extent that he uses the application, that's simply another source of inconsistency. That's not a problem for whether the IJ has straight information because the application is before the IJ directly. We have three arrests in this instance. The second and third arrests become issues. In the assessment, the second arrest, the officer, what do we have from that assessment that is now going to be used by the immigration judge to find that the respondent is not credible or the petitioner is not credible? What you have is unless the asylum officer simply got the story completely wrong in major parts, you have glaring discrepancies in terms of, most importantly in my mind, what happened, how long your client was held after, I forgot now, it's the third arrest or second arrest? The third, I think. Was he held for a day and a half or four weeks? I mean, that's a glaring discrepancy. And that's the key fact. The asylum officer testifies that at the asylum interview, he heard one version and that version is not the same as appears in your client's testimony to the IJ or in the application. What I find from the transcripts of that second-to-the-last hearing is that the asylum officer is quite equivocal as to, one, number one, he doesn't remember at all this particular interview. Number two, he's looking at his notes and he's recognizing that his notes contain errors. Specifically as to the amounts of money or the amount of money that was paid in order to secure the release. How trustworthy is now that assessment if we're going to look at, on the one hand, we're going to say, look, this assessment says this amount of time he was held, but you've testified contrary to that. Well, the assessment officer acknowledges that his assessment contains an incorrect figure that he set. The judge asked him directly, what about this 5,000, this 5K? Was that inerrant? Well, I guess it was. So today we're supposed to now say, well, maybe that's not for us to say. The issue for us is whether there's substantial evidence to support the conclusion which the immigration judge reached some time ago. And the immigration judge is the one that reached the conclusion. We're simply asking is there enough evidence to support the immigration judge's conclusion. And it doesn't appear that there is. He's testified. He was arrested in 87, testified he's arrested in 92, testifies he's arrested in 94. And the judge characterizes his testimony where the glitch comes in is where we have the assessment, the officer's assessment. Well, but the problem is not what he testified to, because if he testified to this and was believed, we'd have a different case. The question is, is there ample evidence or is there sufficient evidence to support the IJ's conclusion that he's not credible? I think that the we need to look at that transcript at the of the hearing where the officer testifies to make that determination. Because I think what happens is you have the decision of the credibility finding by the IJ collapsing right then and there into the testimony of the officer. And I think that the Right. No, without the testimony of the officer as to what he said at that initial interview, the adverse credibility finding can't stand. I mean, it's explicitly based upon that. And that's our position. Thank you. Okay. Thank you. Is this one? May it please the Court. Kelly Zusman appearing on behalf of the Attorney General, Alberto Gonzalez. I think the central issue here is really whether this is a case that should be compared with or distinguished from Judge Berzon's decision in Jarnail Singh. And I believe there are actually seven distinguishing features about this case. There is no question, as you acknowledged earlier, that the IJ's adverse credibility determination was premised upon the discrepancies between what the Petitioner said to the asylum officer and what he said during the hearing. Those seven distinguishing features, though, from this case to Judge Berzon's decision in Singh is, first, that we know that in this case the Petitioner was, in fact, under oath. The asylum officer testified to that, and that appears in the record at page 758. Second, the asylum officer in this case was called as a witness, and the Petitioner had every opportunity to cross-examine the asylum officer about his notes, about their accuracy, and about any potential discrepancies. Third, the interview was conducted in Punjabi with a Punjabi interpreter present that was brought by the Petitioner. Fourth, the Petitioner's attorney was present for the interview with the asylum officer. Fifth, and very significantly, we don't have a summary here. The IJ did not rely solely upon the summary assessment to refer, but instead relied upon 11 pages of detailed notes kept by the asylum officer during this interview. Fifth, the Petitioner was presented with the contradictions and given an opportunity to explain, and the IJ found that those explanations were either implausible or they simply failed to explain the differences between the statements made to the asylum officer and the statements during the testimony. And finally, the inconsistencies in this case were not just about dates. They were about critical issues that went to the heart of the Petitioner's asylum claim. The third arrest, whether or not he was held for a day and a half and beaten once or if he was held for four weeks and beaten five times. Was he arrested at his home and then taken to the farmhouse, or was he arrested at the farmhouse? Was he then taken straight to the police station and held for four weeks, or was he returned to the farmhouse to conduct surveillance? I think what we come away with, particularly with that third arrest, is a completely garbled series of events that's really hard to nail down. And the IJ noted that, especially as to that third arrest, she found it difficult to believe that he would have mixed that up with the second one because it was the third arrest that prompted him to go into hiding and then leave the country. I think for all of these reasons, the IJ's decision in this case, as adopted by the BIA, are supported by evidence in the record. I don't believe any reasonable fact finder would be compelled to conclude differently. And there was no abuse of discretion by the BIA in any of its decisions relative to the motion to reconsider or reopen. I have a question for you that I think is not determinative from my evaluation of the case in front of us, but it occurs to me that some of the difficulties that we're arguing about could be obviated were there a tape recording of the interview. Is it customary not to do tape recordings? Those are very simple to do, of course. Right. I understand from the asylum officer, and this is also in the record in the testimony, that they do it on a random basis. And I agree. It would make this case much easier if they had recorded this. I don't think we'd be hearing this appeal if there had been a tape recording. I mean, there's a lot of effort gone into this appeal, or rather this petition for review, that could have been obviated by the very simple mechanism of a tape recording. I would agree, Your Honor. If there are no further questions, I'll sit down. Thank you. Thank you, Mr. Zuzman. Mr. Guarardo. Page 33 of the government's response, last paragraph, cites numerous instances where the I.J. took pains to clarify the record, saying to the petitioner, slow down, stop interrupting the questioner, and allow the interpreter to keep up. The war always looks a lot different for the generals than it does for the foot soldier. And I would ask that this Court to consider those transcripts, those transcripts that show each and every time that you have questions being asked, that we have to go back and you try to read them. I mean, even if you read them in the English language, you ask yourself, could someone who's a native speaker in their language be saying what I'm reading in English? I don't think so. And it goes back to the motions that we filed, the second motion, motion to reconsider. We're saying we don't have certified court interpreters. Thank you. Thank you, counsel. The matter just argued will be submitted.
judges: Rymer, W. Fletcher, Clifton